## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL 178 HEALTH & WELFARE TRUST FUND, on behalf of itself and all others similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>LANNETT COMPANY, INC.; MYLAN PHARMACEUTICALS, INC., SANDOZ, INC.,<br><br>                    Defendants. | Case No. 16-9890<br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund ("Local 178" or "Plaintiff"), by and through the undersigned counsel, allege the following based upon information and belief (except for those allegations relating to Plaintiff):

### INTRODUCTION

1.      Local 178 brings this action on behalf of itself and on behalf of all persons and entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price of generic levothyroxine sodium marketed and sold by Defendants during the period February 1, 2013 to the present.

2.      Levothyroxine sodium, the second-most-prescribed drug in the United States, has been used for nearly 100 years to treat hypothyroidism (a condition in which the thyroid gland does not produce enough thyroid hormone), to decrease the size of enlarged thyroid glands (also called goiters), and to treat thyroid cancer. Levothyroxine sodium is a synthetic thyroid hormone that is identical to thyroxine, the hormone produced by the thyroid gland in healthy individuals,

1

and as such can augment the body's under-production of thyroxine. Those who need levothyroxine sodium typically take it every day, for their entire lives.

3.      Like its counterpart thyroxine, levothyroxine sodium increases the metabolic rate of cells of all tissues in the body. In the womb and in newborns, the thyroid hormone is important for the growth and development of all tissues, including bones and the brain. In adults, the thyroid hormone helps to maintain brain function, utilization of food, and body temperature, among other effects.

4.      Because of its critical importance to those who need it, the World Health Organization ("WHO") has included levothyroxine sodium in the WHO Model List of Essential Medicines, which "presents a list of minimum medicine needs for a basic health-care system, listing the most efficacious, safe and cost–effective medicines for priority conditions. Priority conditions are selected on the basis of current and estimated future public health relevance, and potential for safe and cost-effective treatment."[1]

5.      Thyroid hormone replacements have been the subject of study since 1891, and levothyroxine sodium was first manufactured, marketed, and sold in 1927. For decades, the Food & Drug Administration ("FDA") permitted the manufacture, marketing, and sale of levothyroxine sodium without formal approval because of its "grandfathered" status. In 1997, however, the FDA notified levothyroxine sodium manufacturers of its intention to regulate the drug moving forward and required manufacturers to submit new drug applications demonstrating the safety and efficacy of their levothyroxine sodium drugs. By late 2002, certain brand-name levothyroxine sodium drugs had earned FDA approval and had entered or re-entered the market.

---

[1]

http://www.who.int/entity/medicines/publications/essentialmedicines/EML_2015_FINAL_amended_NOV2015.pdf?ua=1.

6.      In June 2004, the Defendants each announced FDA approval of their respective generic levothyroxine sodium products. Lannett Company, Inc. ("Lannett") announced FDA approval of its generic levothyroxine sodium (supplied exclusively by Jerome Stevens Pharmaceuticals, Inc.) as bioequivalent to Abbott Laboratories' Synthroid® and King Pharmaceuticals, Inc.'s Levoxyl®, the leading brand-name levothyroxine sodium drugs at that time, with combined revenues of $1.3 billion annually. Sandoz, Inc. ("Sandoz") likewise announced FDA approval of its generic levothyroxine sodium (supplied exclusively by Alara Pharmaceuticals, Inc.) as bioequivalent to Synthroid® and Levoxyl®. Finally, Mylan Pharmaceuticals, Inc. ("Mylan") announced FDA approval of its generic levothyroxine sodium as bioequivalent to Synthroid®, later followed by FDA approval of its generic levothyroxine sodium as bioequivalent to Levoxyl®, Lloyd Inc.'s Levothroid®, and Jerome Stevens Pharmaceuticals, Inc.'s Unithroid® (additional brand-name levothyroxine sodium drugs).

7.      Over the next decade and during the Class Period, Defendants Lannett, Mylan, and Sandoz collectively dominated the market for generic levothyroxine sodium, as they do today. Until 2013, these three Defendants competed against each other in the market for generic levothyroxine sodium, resulting in competitive and low prices. In or around early 2013, however, the Defendants agreed collectively to raise prices and forgo competition, which resulted in staggering price increases for generic levothyroxine sodium from 2013 to the present day.

8.      Local 178 alleges that Defendants Lannett, Mylan, and Sandoz—the principal marketers and sellers of generic levothyroxine sodium—have conspired, combined, and contracted to fix, raise, maintain, and stabilize the prices at which generic levothyroxine sodium would be sold.

9.     The claims in this case arise from a broad conspiracy among manufacturers of generic drugs to fix the prices charged for various generic drugs in recent years. This conspiracy was effectuated by joint activities and direct company-to-company, person-to-person contacts between and among generic drug manufacturers, including through trade shows, customer events, trade association gatherings, and private dinners. The unlawful acts undertaken with respect to generic levothyroxine sodium arise from that larger conspiracy.

10.     Beginning in early 2013, each Defendant began raising the price of generic levothyroxine sodium—eventually doubling or even tripling the price of generic levothyroxine sodium during the Class Period. For example, as of January 2013, the average per-unit price of 300 microgram generic levothyroxine sodium sold by Lannett, Mylan, and Sandoz was $0.25107; by September 2016, that average per-unit price had increased by 237% to $0.84648. Similarly, as of January 2013, the average per-unit price of 125 microgram generic levothyroxine sodium sold by Lannett, Mylan, and Sandoz was $0.13310; by September 2016, that average per-unit price had increased by 267% to $0.48840.

11.     These and other recent precipitous price hikes by drug manufacturers for generic drugs have prompted extensive scrutiny by the press, the United States Congress, and federal and state antitrust regulators. In 2014, the Antitrust Division of the United States Department of Justice ("DOJ") commenced a wide-ranging criminal investigation of this broad conspiracy and caused grand jury subpoenas to be issued to various generic drug manufacturers in connection with this investigation.[2] In July 2014, the State of Connecticut likewise initiated an investigation into suspicious price increases for certain generic pharmaceuticals, in coordination with other

---

[2] The investigation encompasses a number of generic drugs and, as the scope of the states' and the DOJ's investigation is further clarified, Plaintiff reserves the right to amend its complaint to add more parties and/or claims.

states. The information developed through that multi-state investigation, which is still ongoing, has uncovered evidence of a broad, well-coordinated, and long-running series of schemes to fix the prices and allocate markets for various generic drugs in the U.S.

12.     All of the Defendants—Lannett, Mylan, and Sandoz—have been subpoenaed by the DOJ as part of its ongoing investigation of anticompetitive practices in the generic pharmaceutical industry. These subpoenas accompanied public reports that highlighted concerns about the rising prices of generic drugs generally, and generic levothyroxine sodium more specifically. For example, a recent joint investigation by the *Wisconsin Center for Investigative Journalism*, *Wisconsin Health News*, and *Wisconsin Public Radio* revealed that "generic hypothyroidism drug price[s] tripled . . . . The cost of a single levothyroxine sodium tablet, the generic of Synthroid, ranged from 14 to 51 cents from 2011 to 2016."[3] In an October 2016 *Forbes* article titled "Another Drug Company That Raises Prices Like Crazy," investigative journalist Nathan Vardi noted that "[s]tarting around April 2013, Lannett increased the price of levothyroxine, a widely used thyroid medicine, by 158% in two years."[4]

13.     These extraordinary price increases were not the result of supply shortages, demand spikes, or other market conditions. Rather, they were the result of Defendants' coordinated and collusive efforts and agreement, which violate the Sherman Act (15 U.S.C. § 1, *et seq*.), as well as state antitrust, consumer protection, and common laws.

14.     As a result of Defendants' unlawful conduct, Plaintiff and the other members of the proposed Classes paid artificially inflated prices during the Class Period that exceeded the

---

[3] http://wisconsinwatch.org/2016/11/costs-of-widely-prescribed-drugs-jumped-up-to-5241-percent-in-recent-years/.

[4] http://www.forbes.com/sites/nathanvardi/2016/10/06/another-drug-company-that-raises-prices-like-crazy/2/#122c51b77ef5.

amount they would have paid if a competitive market had determined the prices for generic levothyroxine sodium, and the Defendants realized more revenue and profits than they would have received if a competitive market had determined the prices for generic levothyroxine sodium.

## JURISDICTION AND VENUE

15.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Classes by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

16.     This action also includes claims under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in Counts Two through Four below.

17.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367. Finally, jurisdiction is conferred upon this Court by the Class Action Fairness Act of 2005 ("CAFA"), which amended 28 U.S.C. § 1332 to add a new subsection (d) authorizing federal jurisdiction where "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." The $5 million amount-in-controversy and diverse-citizenship requirements of CAFA are satisfied here.

18.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted

business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.[5]

19.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold generic levothyroxine sodium throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

<u>**PLAINTIFF**</u>

20.     Plaintiff Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund ("Local 178" or "Plaintiff"), located in Springfield, Missouri, is a local union that provides health care and other benefits to its members who reside in Missouri as well as other locations throughout the United States, through its not-for-profit trust fund. Local 178 indirectly purchased generic levothyroxine sodium during the Class Period as defined below, and was injured in its business or property by reason of the violations of law alleged herein. For prescriptions of generic drugs, such as generic levothyroxine sodium manufactured by one or more Defendants, the employee plan participant typically pays a portion of the cost of the prescription. Participating pharmacies collect the co-payment from the employee plan participant and bill Local 178 for the remaining cost of the generic levothyroxine sodium purchases.

---

[5] As used herein, the term "Class Period" means February 1, 2013 to the present.

**DEFENDANTS**

21.     Defendant Lannett Company, Inc. ("Lannett") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 13200 Townsend Road, Philadelphia, PA 19154. During the Class Period, Lannett marketed and sold generic levothyroxine sodium to customers in this District and other locations in the United States.

22.     Defendant Mylan Pharmaceuticals, Inc. ("Mylan") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1000 Mylan Boulevard, Canonsburg, PA 15317. During the Class Period, Mylan manufactured, marketed, and sold generic levothyroxine sodium to customers in this District and other locations in the United States.

23.     Defendant Sandoz, Inc. ("Sandoz") is a corporation organized and existing under the laws of the State of Colorado with its principal place of business at 100 College Rd W, Princeton, NJ 08540. During the Class Period, Sandoz marketed and sold generic levothyroxine sodium to customers in this District and other locations in the United States.

24.     Whenever in this complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

25.     All acts alleged in this complaint to have been done by Defendants were performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

26.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

27.     At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

28.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

29.     During the Class Period, Defendants sold substantial quantities of generic levothyroxine sodium in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

## FACTUAL ALLEGATIONS

### The Industry

30.     Defendants manufacture, market, and sell, among other products, generic versions of branded drugs, including generic levothyroxine sodium, for which FDA approval can be sought only after the patent on the corresponding branded drug expires. Here, generic levothyroxine sodium first entered the marketplace in 2004 with FDA approval—on the heels of

brand-name levothyroxine drugs Synthroid® and Levoxyl®, among others, for which any patent protection had lapsed long ago.

31.     According to the FDA's Glossary, a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[6] Once the FDA approves a generic drug as "'therapeutically equivalent'" to a brand name drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product." *Id*.

32.     A drug company seeking approval to market and sell a generic equivalent of a brand name drug must refer to the Reference Listed Drug ("RLD") in its Abbreviated New Drug Application ("ANDA"). *Id*. Once the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the product to the RLD, an applicant may manufacture, market, and sell the generic drug product, which provides a safe, effective, low-cost alternative to the American public. *Id*.

33.     Furthermore, the FDA will generally assign a Therapeutic Equivalence Code ("TE Code") of AB to those products it determines to be bioequivalent. [7] This coding system allows users to quickly determine important information about the drug product in question.[8] For example, the Food & Drug Administration ("FDA") states that "[p]roducts generally will be coded AB if a study is submitted demonstrating bioequivalence. Even though drug products of distributors and/or repackagers are not included in the List, they are considered therapeutically

---

[6] FDA Glossary, available at
http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[7] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/
ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

[8] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#TEC.

equivalent to the application holder's drug product if the application holder's drug product is rated AB."[9]

34.     The entire purpose of authorizing a generic drug industry in the United States was to encourage the manufacture of less expensive, non-branded substitutes for branded prescription drugs that either had no patent exclusivity or for which the patent exclusivity was expiring. Once the patent on a brand-name drug expires, generic manufacturers can move in, creating more competition and lower prices. In a January 2012 report, the GAO noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[10]

35.     Due to the significant price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally and typically substitute the generic drug when presented with a prescription for the branded drug. Since passage of the Hatch-Waxman Act (Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 355, 360cc; 35 U.S.C. §§ 156, 271)), every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

36.     According to a report by the Generic Pharmaceutical Association ("GPhA"), nearly 3.8 billion (88%) of the total 4.3 billion prescriptions dispensed in the U.S. in 2014 were filled using generic drugs.[11]

---

[9] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

[10] http://www.gao.gov/assets/590/588064.pdf.

[11] http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

37.     There has been substantial consolidation in the generic drug industry recently. The result of the generic drug industry's consolidation has been an environment ripe for collusion and higher prices for consumers. Generic manufacturers merged as a partial reaction to the consolidation of the distributors, the logic being that generic manufacturers could exert leverage to charge higher prices if distributors were stripped of the option of negotiating lower prices with other generic manufacturers offering therapeutically equivalent drugs. Market consolidation has also resulted in more generic product lines being combined or discontinued, further reducing price competition.

**Market for Generic Levothyroxine Sodium**

38.     Levothyroxine sodium is prescribed widely to treat hypothyroidism (by restoring thyroid hormone balance in individuals with low thyroid hormone levels), prevent the growth of goiters, and treat thyroid cancer (by suppressing thyroid hormone release from cancerous thyroid nodules). Levothyroxine sodium is a human-made thyroid hormone identical to thyroxine, the hormone that is naturally made by the thyroid gland.

39.     Levothyroxine sodium, including the generic levothyroxine sodium marketed and sold by Defendants, comes in twelve tablet dosage levels, ranging from 25 micrograms to 300 micrograms. When a doctor first prescribes levothyroxine sodium, he or she will monitor the patient for the first few months to ensure prescription of the right dosage level. Typically, patients requiring levothyroxine sodium will take the drug once each day, for their entire lives.

40.     Generic levothyroxine sodium is the bioequivalent of Synthroid®, Levoxyl®, Levothroid®, and Unithroid®, the leading brand-name levothyroxine sodium drugs.

41.     Defendants collectively sell hundreds of millions of dollars-worth of generic levothyroxine sodium every year in the United States.

42.     The market for generic levothyroxine sodium is controlled by Defendants, and it was controlled by Defendants during the Class Period.

**Defendants' Pricing Conduct for Generic Levothyroxine Sodium**

43.     Generic levothyroxine sodium pricing was remarkably stable until early 2013.

44.     During the Class Period and beginning in or around early 2013, however, the Defendants, through their sales representatives and senior management, met in person and/or otherwise communicated by phone, email, text message, and other means to discuss pricing and pricing strategies for generic levothyroxine sodium, ultimately agreeing to forgo competition and fix the prices at which generic levothyroxine sodium would be sold in its various dosages.

45.     During the Class Period, the Defendants also communicated indirectly to facilitate and monitor their unlawful agreement—using their quarterly investor earnings calls to lament earlier price wars, call for "rational" and "responsible" pricing behavior, signal their intention to raise prices (and continue doing so), and address their massive price increases for generic levothyroxine sodium.

46.     For example, the following exchange took place during Lannett's September 10, 2013 earnings call between a research analyst and Lannett CEO Arthur Bedrosian, in which Bedrosian expressed his gratitude to a competitor for raising the price of generic levothyroxine sodium and characterized companies that raise prices in conjunction with their competitors as "responsible":

**Randall Stanicky - Canaccord Genuity, Research Division**

Arthur, can you just talk about the Levo pricing dynamics and any benefit that you've been able to capture from that as you look at 2014?

**Arthur P. Bedrosian**

Is that a legal price?

**Randall Stanicky - Canaccord Genuity, Research Division**

No, the Levothyroxine. Yes, one of your competitors took pricing up quite significantly. I'm just wondering what your reaction was, what you've done? And as we look at the numbers, how much of a benefit could be -- could you have captured from that?

**Arthur P. Bedrosian**

*You mean after I sent them the thank you note?* I'm just kidding.

**Randall Stanicky - Canaccord Genuity, Research Division**

Exactly.

**Arthur P. Bedrosian**

I'm always grateful to see *responsible* generic drug companies realize that our cost of doing business is going up as well. . . . *So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful. Because Lannett tends to be active in raising prices*. . . . .

47.     During Lannett's November 7, 2013 earnings call, Bedrosian reported that "price increases on key products" including generic levothyroxine sodium were among "[t]he primary drivers for our outstanding first quarter performance," noting further "that we believe these positive trends will continue throughout fiscal 2014." Bedrosian also noted that "these price increases that are going on in the industry, *I think they're going to stick for all the companies*." CFO Martin Galvan added that, in the preceding quarter, "[n]et sales for our largest product category, thyroid deficiency, grew to $20 million or 44% of our total net sales."

48.     During Lannett's February 6, 2014 earnings call, Bedrosian again reported "outstanding financial results for the quarter. For the fiscal 2014 second quarter, we recorded the highest net sales, gross margin and net income in our company's history. Net sales increased 84% to $67 million. Gross margin more than tripled. And net income grew to $17 million, which was nearly 6x the net income we recorded in last year's second quarter." And, according to

14

Galvan, "the key products that are driving . . . our gross margin from a price increase perspective, the key ones from a magnitude perspective are the Levothyroxine Sodium product and also Digoxin." Bedrosian also commented, in response to a question about the impact, if any, of reported Levoxyl shortages on Lannett's generic levothyroxine sodium business: "we don't see it impacting our business."

49.     During Lannett's May 7, 2014 earnings call, Bedrosian again announced rosy financial results for a quarter in which "gross margin more than tripled" from the previous year, marked by a highly profitable "50% increase on Levo," which nevertheless still kept prices for Lannett's generic levothyroxine sodium "at 75% of the brand [drugs] with this new increase."

50.     During Lannett's August 27, 2014 earnings call, Bedrosian explained that Lannett did not anticipate any new competition for generic levothyroxine sodium: "*We've heard nothing in the trade* and we've made no arrangements to anticipate anything for this fiscal year." Bedrosian commented further on the absence of future competitors, noting one recently stymied attempt at market entry: "But we did know one case, a company in Europe that indicated they were going to get an approval and they reached out to a competitor to distribute it to them but we know that, that competitor turned them down. *When we called them, they denied they even were working on a product*." Bedrosian also confirmed the tight concentration in the market for generic levothyroxine sodium:

> Well, the way I describe it, it's really between Mylan and Lannett, and I tend to give Mylan a little more market share than they currently have. I tend to tell people it's about a 70-30 split. If you factor in Sandoz . . . Mylan might be at 68 and Sandoz might have picked up a couple of percentage points. But it really is, the bulk of the market is between Mylan and Lannett in terms of units that are sold.

51.     During Lannett's November 3, 2014 earnings call, Bedrosian was asked about the prospect of increased competition from Mylan and responded: "*Mylan is one of those rational*

*competitors, so we're not really expecting anything crazy from them.* . . . [E]ach one of us has our favorite customers and usually we get business to start with from our customers that prefer doing business to one company versus another. No major change on either one of the Levos, Digoxins for the year though." As for continued price increases, Bedrosian observed "let's just say that, *the rocket ship is leveling off now that it's broken through the atmosphere*."

52.     During Lannett's February 4, 2015 earnings call, Bedrosian shared his views on the future of the generic drug industry:

> We don't see that kind of behavior sustainable [referring to earlier price wars],
> and we don't see it going further into the future. I think you're going to find more
> capital pricing, more – *I'll say less competition*, in a sense. *You won't have price
> wars*. . . . I just don't see the prices eroding like they did in the past.

53.     During Lannett's August 25, 2015 earnings call, Bedrosian conveyed his optimism about continued pricing growth:

> [E]verybody keeps bringing up the sustainability of price increases. Well, they
> seem to be sustainable. I'm not saying that there hasn't been some weakness here
> and there, but overall, I feel the price increases have been sustainable and we're
> going into almost the third year now with some of these increases. *So we think it's
> a more rational market we're in.*

54.     During Lannett's February 3, 2016 earnings call, Galvan noted that "[l]evothyroxine is our largest product. The gross margin on the product[,] *it's above 50%*."

55.     During Lannett's August 23, 2016 earnings call, Bedrosian celebrated "net sales of $45.9 million" for Lannett's generic levothyroxine sodium, "a record for that category." In response to a question about the absence of price discounts by new entrants in the generic drug industry, Bedrosian responded:

> *So price usually doesn't get you to results you want. So, I think a lot of people
> have learned that lesson by now. But some of the dumber newer companies
> continue to go down that path, because they haven't figured it out yet for
> themselves.* But I do see occasional situations like that, but not a lot.

Bedrosian applauded the "expertise" of competitors that do not succumb to price discounting, which "in itself moderates some of the crazy behaviors that are occurring when some countries decided to enter the U.S. market and grab market share. As a result, I've seen those people have been maturing in the market in realizing they need to make it profit as well in the United States."

56.     Lannett's view that forgoing price competition is "rational" behavior among generic drug competitors was shared by Mylan as well. For example, during Mylan's October 25, 2012 earnings call, before the beginning of the Class Period, Mylan CEO Heather Bresch conveyed: "You've heard me quarter after quarter coming and saying *we weren't going to chase the bottom, that there's been irrational behavior and that we would continue to hold steady* and control what we can control."

57.     Seven months later, during Mylan's May 2, 2013 earnings call, Bresch again lamented earlier price competition as "chasing the floor" and signaled Mylan's intention to raise prices:

> I think that there was very whacked-out prices, dirt cheap, literally cheaper than dirt for some of those older products. And the bar needs to go. It needed to go up from a quality perspective, and it needs to go up and get rebalanced from a pricing perspective. So I think that we have certainly seen that. And I'm not -- there's extremes on both ends. *But I think, overall, the bar is going up. And so that stability and that tide will go with it.* And so I see that staying, because I think people realized the detriment it did to this therapeutic category by having the dynamics in place that were.

58.     During the Class Period, Lannett, Mylan, and Sandoz were active members of the Generic Pharmaceutical Association ("GPhA"), which describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic

industry."[12] The current GPhA Board of Directors includes Mylan CEO Heather Bresch (Chair) and Sandoz President Peter Goldschmidt. GPhA's frequent functions and events each year afforded the Defendants' executives various opportunities to communicate in-person during the Class Period. Those events and functions included, but are not limited to, the October 1-3, 2012 GPhA Fall Technical Conference in Bethesda, MD (which Lannett, Mylan, and Sandoz attended); the February 20-22, 2013 GPhA Annual Meeting in Orlando, FL (which Mylan and Sandoz attended); the June 4-5, 2013 GPhA/FDA CMC Workshop in Bethesda, MD (which Lannett, Mylan, and Sandoz attended); and the October 28-30, 2013 GPhA/FDA Fall Technical Conference in Bethesda, MD (which Lannett, Mylan, and Sandoz attended).

59.    The National Average Drug Acquisition Cost ("NADAC") is a pricing reference file published by the Centers for Medicare and Medicaid Services that is based on average actual acquisition costs of various outpatient drugs collected from a monthly survey of retail community pharmacies across the United States.[13]

60.    The NADAC data for generic levothyroxine sodium reveals a pattern of massive price increases beginning in early 2013, after which prices remained elevated well above their previous competitive levels to the present day.

61.    For example, the chart below, based on NADAC data, reveals a dramatic increase in the average per-unit price for generic levothyroxine sodium 25mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz on or around February 2013 followed by continued price elevation through 2015:

---

[12] http://www.gphaonline.org/about/the-gpha-association.

[13] *See* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.



62.    The NADAC data for generic levothyroxine sodium 50mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz reveals a strikingly similar pattern:



63.     The NADAC data for generic levothyroxine sodium 75mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz also reveals a similar pattern:



64.     The NADAC data for generic levothyroxine sodium 88mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz also reveals a similar pattern:



65.     The NADAC data for generic levothyroxine sodium 100mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz also reveals a similar pattern:



66.     The NADAC data for generic levothyroxine sodium 112mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz also reveals a similar pattern:



67.     The NADAC data for generic levothyroxine sodium 125mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz also reveals a similar pattern:



68.    The NADAC data for generic levothyroxine sodium 137mcg tablets marketed and

sold by Defendants Lannett, Mylan, and Sandoz also reveals a similar pattern:



69.     The NADAC data for generic levothyroxine sodium 150mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz also reveals a similar pattern:



70.    The NADAC data for generic levothyroxine sodium 175mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz also reveals a similar pattern:



71.    The NADAC data for generic levothyroxine sodium 200mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz also reveals a similar pattern:



72. The NADAC data for generic levothyroxine sodium 300mcg tablets marketed and sold by Defendants Lannett, Mylan, and Sandoz also reveals a similar pattern:



73.     In every case, NADAC prices spiked dramatically in late 2013 and again in late 2014 before coming to rest at levels that were two to three times higher than before the Class Period. As of December 2016, the NADAC price of generic levothyroxine sodium remains approximately 200% to 300% higher than late 2012 levels.

74.     These substantial across-the-board price increases reflected in the NADAC data were not the result of one maverick manufacturer's unilateral decision to raise prices exponentially—which would not have been sustainable in a competitive environment as other generic levothyroxine sodium manufacturers gained market share by selling the same product at a lower price. Rather, the sustained price elevation reflected in the NADAC data, across generic levothyroxine sodium in various dosages, was and is the result of a conspiracy among Defendants to artificially raise, fix, maintain, and/or stabilize the price of generic levothyroxine sodium sold in the United States.

### The Effects of Defendants' Pricing Conduct

75.     Defendants' sudden and massive price increases present a sharp departure from the previous years of low and stable prices. This in itself is indicative of collusion.

76.     There were no reasonable justifications for this abrupt shift in pricing conduct. Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage. No supply disruption was reported by the Defendants with respect to generic levothyroxine sodium.

77.     And because generic pharmaceutical manufacturers do not need to incur the large research and development costs that brand manufacturers absorb in developing new drugs, the price increases cannot be attributed to the need to fund research and development.

78.     Industry analysts have suggested that recent price increases for generic levothyroxine sodium are the result of collusion among manufacturers. Indeed, Richard Evans at *Sector & Sovereign Research* recently wrote: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[14]

79.     The investor platform Seekingalpha.com recently explained, in November 2016, "Why We Remain Short Lannett," concluding that "[w]e see evidence of collusion between the generics":

> [L]et's look at Levothyroxine, in this case Mylan (NASDAQ:MYL) gets the ball rolling with consecutive price increases in 2013 and 2014 that are both matched within days by LCI [Lannett] and Sandoz. Levothyroxine is not a new product (first synthesized in the 1920's) but because of the cozy pricing relationship displayed by the three generic competitors this remains a multi $100m generics market. *Again one has to question the value of competition.*[15]

80.     This abrupt shift in the pricing of generic levothyroxine sodium has had a catastrophic effect on consumers. As noted in letters sent to generic drug manufacturers as part of a Congressional investigation into unexplained price increases:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is

---

[14] http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[15] http://seekingalpha.com/article/4024425-remain-short-lannett-internal-collusion-investigation-assuage-fears.

having a 'very significant' impact on their ability to remain in business to continue serving patients." (Footnotes omitted).[16]

81.        *NPR*, in collaboration with *Kaiser Health News*, reported one consumer's plight in July 2016 in his or her own words:

> I take levothyroxine, the generic form of Synthroid, to treat a thyroid disorder. This generic has been on the list of drugs that cost $10 for a 90-day supply at my pharmacy for as long as I can remember. Starting in April, the drug was dropped from the list and the price rose 300 percent. The pharmacist tells me all the generic drug manufacturers are raising prices. How is it possible that this drug increased in price so quickly?[17]

82.        A meeting of the minds among the competing sellers of generic levothyroxine sodium assured them increased profits.

83.        These price increases are reflected in the Defendants' financial results during the Class Period.

84.        For example, Mylan reported tremendous revenue and profit growth from 2013 to 2015, increasing total annual revenues from $6.9 billion to $9.429 billion and increasing annual gross profits from $3.04 billion to $4.216 billion.

85.        Lannett, meanwhile, reported increases in annual net sales from $151 million in 2013 to $406 million in 2015 as well as increases in annual gross profits from $57 million in 2013 to $306 million in 2015.

86.        Finally, Sandoz reported growth in core returns on net sales, up from 16.4% in 2014 to 18.1% in 2015—a 10.4% increase.

---

[16] The letters sent to generic drug manufacturers may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[17] http://www.npr.org/sections/health-shots/2016/07/26/487367877/insurers-may-share-blame-for-increased-price-of-some-generic-drugs.

**Congressional and Regulators' Responses to Rising Generic Drug Prices**

87.     As noted above, drug manufacturers' dramatic and unexplained price hikes have engendered extensive scrutiny by the United States Congress and by federal and state antitrust regulators.

88.     In a January 8, 2014 letter to members of key committees of the United States House of Representatives and Senate, Douglas P. Hoey, Chief Executive Officer of the National Community Pharmacists' Association, asked Congress to conduct an investigation of generic drug price increases.[18]

89.     On October 2, 2014, Representative Elijah E. Cummings ("Cummings"), Ranking Member of the House Committee on Oversight and Government Reform, and Senator Bernie Sanders ("Sanders"), Chairman of the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions, sent letters to Defendants Lannett, Mylan, and 12 other drug manufacturers ("October Letters") asking for detailed information on the generic price hikes.[19]

90.     On November 20, 2014, Sanders's committee held a hearing titled "Why Are Some Generic Drugs Skyrocketing In Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs.

91.     At the Senate Hearing, Stephen W. Schondelmeyer, Professor of Pharmaceutical Management & Economics at the University of Minnesota testified concerning "signals of market failure" and noted that "nearly 20% (27 of 280) of the widely used generic drug prices saw an annual price increase of 50% or more in 2013." Professor Schondelmeyer identified

---

[18] *See* https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf.

[19] The October Letters may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

generic levothyroxine sodium among generic drug products with extremely high annual price hikes in 2013, citing "9 different strengths . . . with annual increases ranging from 44% to 63%."

92.     Sanders and Cummings followed up on the Senate Hearing by writing a letter on February 24, 2015 to the Office of the Inspector General ("OIG") of the Department of Health & Human Services, asking it to investigate the effect that price increases of generic drugs have had on generic drug spending within the Medicare and Medicaid programs.[20] The OIG responded in a letter dated April 13, 2015, noting it planned to engage in a review of quarterly average manufacturer prices for the top 200 generic drugs from 2005 through 2014.[21]

93.     In the meantime, the Antitrust Division of the United States Department of Justice ("DOJ") commenced a wide-ranging criminal investigation of generic drug pricing and has caused grand jury subpoenas to be issued to various generic drug manufacturers in connection with this investigation. According to a June 26, 2015 report by the service *Policy and Regulatory Report* ("PaRR Report") (available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf):

> A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."

94.     On November 3, 2016, *Bloomberg* reported:

> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.

. . . .

---

[20] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[21] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

Charges could extend to high-level executives, according to the people. The antitrust division, which has an immunity program to motivate wrongdoers to confess and inform on others, has stepped up its commitment to holding individuals responsible.

95.     Most recently, on November 7, 2016, the publication *Mlex* reported that the DOJ had received assistance from a leniency applicant beginning in the summer of 2016:

> While the Justice department didn't have a whistleblower at the beginning of the investigation, it is understood that this summer a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations. The company is understood to be privately held and hasn't publicly disclosed its involvement in the investigation.

96.     The DOJ is poised to file criminal indictments—and began that process earlier this month. On December 12, 2016, the DOJ charged Jeffrey Glazer, a former chief executive officer of Heritage Pharmaceuticals, Inc., and Jason Malek, a former president of Heritage Pharmaceuticals, Inc., with "knowingly enter[ing] into and engag[ing] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States . . . [and] including glyburide, the primary purpose of which was to allocate customers and fix and maintain prices of glyburide sold in the United States."

97.     State attorneys' general, led by the Connecticut Attorney General, have also pursued their own investigations, culminating most recently in a 19-state complaint filed on December 14, 2016 charging Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage Pharmaceuticals, Inc., Mayne Pharma (USA), Inc., Mylan, and Teva Pharmaceuticals USA, Inc. "with entering into contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the

markets for Doxycycline Hyclate Delayed Release ('Doxy DR') and Glyburide in the United States."[22] The complaint notes that "the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time." *Id*. The complaint also details Mylan's role in both conspiracies, including Mylan's frequent communications with other competitors to facilitate and further their agreement to fix prices, which began "as early as 2013." *Id*.

98.     On November 9, 2016, Mylan disclosed in its 10-Q report that it had received numerous federal and state subpoenas in conjunction with the marketing, pricing, and sale of generic drugs:

> On December 3, 2015, a subsidiary of Mylan N.V. received a subpoena from the Antitrust Division of the U.S. DOJ seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products.

> On September 8, 2016, a subsidiary of Mylan N.V., as well as certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with competitors about such products. Related search warrants also were executed. . . . .

> On December 21, 2015, the Company received a subpoena and interrogatories from the Connecticut Office of the Attorney General seeking information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products.[23]

---

[22] http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[23]

https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

99.     On November 4, 2016, Lannett disclosed in its 10-Q report that it too had received numerous federal and state subpoenas in conjunction with the marketing, pricing, and sale of generic drugs:

> In July 2014, the Company received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin. According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law. In June 2016, the Connecticut Attorney General issued interrogatories and a subpoena to an employee of the Company in order to gain access to documents and responses previously supplied to the Department of Justice. . . . .

> In fiscal year 2015 and 2016, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoenas request corporate documents of the Company relating to corporate, financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.[24]

100.    According to a November 2016 *Bloomberg* report, "Novartis's Sandoz unit [including Fougera] got a U.S. Justice Department subpoena in March [2016] requesting documents related to marketing and pricing of copycat medicines."[25]

101.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's

---

[24] http://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=11214259&type=HTML&symbol=LCI&companyName=Lannett+Co+Inc&formType=10-Q&dateFiled=2016-11-04.

[25] https://www.bloomberg.com/news/articles/2016-11-13/novartis-said-to-hold-talks-to-buy-u-s-generics-maker-amneal.

*Antitrust Division Manual*.[26] Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.* Thus, the fact that the Defendants and certain of their employees received federal grand jury subpoenas is a strong indication that antitrust offenses have occurred.

102.    Commentators have also taken note of the criminal subpoenas. As reported on one legal website:

> The Justice Department's subpoenas focus on sharing and exchanging of pricing information and other issues among generic drug companies. The initial subpoenas, including two senior executives, suggest that the Justice Department has specific information relating to their participation in potentially criminal conduct. It is rare for the Justice Department to open a criminal investigation with specific subpoenas for individuals, along with company-focused subpoenas.
>
> Given the breadth of such a potential cartel investigation, the Justice Department's inquiry of the generic pharmaceutical industry could be significant. The prices for a large number of generic drug prices have increased significantly over the last year. There does not appear to be any rational explanation for such increases involving a diverse set of products.

---

[26] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

The scope of these price increases and the timing of them certainly raise serious concerns about collusive activity among competitors.[27]

103.    As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "[a] DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[28]

104.    Likewise significant is *Mlex*'s confirmation that a leniency applicant has sought amnesty from the DOJ. As the DOJ notes on its web site (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

What is more, the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id.*

### Factors Increasing the Levothyroxine Sodium Market's Susceptibility to Collusion

105.    Publicly available data on the generic levothyroxine sodium market in the United States demonstrates that it is susceptible to price-fixing by the Defendants. Factors that make a

---

[27] http://www.jdsupra.com/legalnews/criminal-global-cartel-focus-on-generic-92387/.

[28] https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the goods of cartel participants; (6) absence of a competitive fringe of sellers; and (7) intercompetitor contacts and communication.

106.   *Industry Concentration*. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

107.   In the United States generic levothyroxine sodium market, the Defendants named here account for all sales of the drug in question (in oral tablet form), as was the case during the Class Period. What is more, the number of competitors has historically been limited to these three Defendants, with respective market shares of 30% (Lannett), 68% (Mylan), and 2% (Sandoz), according to Lannett CEO Bedrosian's August 2014 estimates.

108.   The market for generic levothyroxine sodium is mature, and the Defendants can only gain market share by competing on price.

109.   The Defendants—and no other firms—currently control the market.

110.   *Barriers to Entry*. Supracompetitive pricing (at odds with pricing that can be sustained in a competitive environment) in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

111.   Here, there are significant capital, regulatory, and intellectual property barriers to entry in the market for generic levothyroxine sodium.

112.   Manufacturing costs, coupled with regulatory oversight, represent a substantial

barrier to entry into the generic levothyroxine sodium market. Intellectual property costs can also be sizable.

113.    Entry into the generic levothyroxine sodium market (oral tablets) has not occurred since the Defendants began marketing and selling generic levothyroxine sodium in 2004.

114.    ***Demand Inelasticity***. Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life—food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life. In other words, a person on the verge of dying of thirst will pay almost anything for drinking water. In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining revenues and profits.

115.    Generic levothyroxine sodium offers potentially life-saving relief to those suffering from hypothyroidism and thyroid cancer. Because the need for generic levothyroxine sodium is great among those who are so suffering, patients have little choice but to purchase levothyroxine at the price at which it is offered. Thus, generic levothyroxine sodium is an excellent candidate for price-fixing because price increases will result in more revenue, rather than less.

116.    ***Lack of Substitutes***. For those whose bodies do not produce enough thyroid hormone, there is no substitute for levothyroxine sodium. Nor do brand name levothyroxine sodium drugs provide reasonable alternatives for generic levothyroxine sodium—for two

reasons. First, even at the inflated levels witnessed during the Class Period, brand name levothyroxine sodium drugs have historically cost significantly more than the generic levothyroxine sodium marketed and sold by the Defendants. Second, despite FDA approval of generic levothyroxine sodium as bioequivalent, some prescribing doctors recommend that patients start on and continue with either the brand name or generic levothyroxine sodium—and not switch between the two—because of speculation about potential differences in maintaining precise thyroid hormone levels.

117.   ***Standardized Product with High Degree of Interchangeability***. A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the good in question and it is easier to monitor these prices effectively. Here, the generic levothyroxine sodium made by the Defendant manufacturers each contain identical active ingredients and are viewed as interchangeable by the pharmacies that fill the prescriptions.

118.   ***Absence of a Competitive Fringe of Sellers***. Companies that are not part of the conspiracy can erode at conspirators' market shares by offering products at a lower, more competitive price. This reduces revenue and makes sustaining a conspiracy more difficult. In the market for generic levothyroxine sodium, there is no realistic threat that a fringe of competitive sellers will take market share from Defendants. The Defendants have oligopolistic power in the market for generic levothyroxine sodium, which facilitates their ability to raise prices without losing market share to non-conspirators.

119.   ***Intercompetitor Contacts and Communications***. In order to be successful, collusive agreements require a level of trust among the conspirators. Collaboration fostered

through industry associations, trade shows, customer events, and private dinners facilitate relationships between individuals who would otherwise be predisposed to compete vigorously with each other. The state attorneys general have characterized the generic drug industry as "cozy." Here, for example, the Defendants are long-time members of or participants in the GPhA, which meets frequently and describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry." [29] Thus, representatives of the Defendants have opportunities to meet and conspire at functions of this group, including GPhA meetings immediately prior to the announcement of the generic levothyroxine sodium price increases, as well as at numerous other industry gatherings and private functions.

120.    The grand jury subpoenas discussed above lend further support to the conclusion that intercompetitor communications occurred among the Defendants with respect to the pricing of generic levothyroxine sodium. Indeed, according to the previously identified PaRR Report, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."

## DEFENDANTS' ANTITRUST VIOLATIONS

121.    During the Class Period, the Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of generic levothyroxine sodium in the United States.

---

[29] http://www.gphaonline.org/about/the-gpha-association.

122.    In formulating and effectuating the contract, combination or conspiracy, the Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic levothyroxine sodium sold in the United States. These activities included the following:

       a.    Defendants participated in meetings and/or conversations to discuss the price of generic levothyroxine sodium in the United States;

       b.    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic levothyroxine sodium sold in the United States;

       c.    Defendants agreed during those meetings and conversations to fix the price of generic levothyroxine sodium; and

       d.    Defendants issued price announcements, customer bids, and price quotations in accordance with their agreements.

Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

123.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiff and members of the Classes purchased generic levothyroxine sodium from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

124.    Defendants' contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various states.

125.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Classes have been injured in their business and property in that they have paid more for generic levothyroxine sodium than they would have paid in a competitive market.

126.    The unlawful contract, combination, or conspiracy has had the following effects, among others:

    a.      price competition in the market for generic levothyroxine sodium has been artificially restrained;

    b.      prices for generic levothyroxine sodium sold by the Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

    c.      purchasers of generic levothyroxine sodium from the Defendants have been deprived of the benefit of free and open competition in the market for generic levothyroxine sodium.

## CLASS ACTION ALLEGATIONS

127. Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price for Defendants' generic levothyroxine sodium from February 1, 2013 through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic levothyroxine sodium for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay"

consumers whose purchases of Defendants' generic levothyroxine sodium were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

128.   Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states listed below (the "Indirect Purchaser States")[30] on behalf of the following class (the "Damages Class"):

All persons and entities in the Indirect Purchaser States who purchased, paid, and/or provided reimbursement for some or all of the purchase price for Defendants' generic levothyroxine sodium from February 1, 2013 through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic levothyroxine sodium for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic levothyroxine sodium were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

129.   The Nationwide Class and the Damages Class are referred to herein as the "Classes."

---

[30] The "Indirect Purchaser States" consist of Alabama, Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

130.  While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are millions of members in each Class.

131.  Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize prices of generic levothyroxine sodium;

b.   The identity of the participants of the alleged conspiracy;

c.   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.   Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

e.   Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

f.   Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

g.   Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

h.   The effect of the alleged conspiracy on the prices of generic levothyroxine sodium sold in the United States during the Class Period;

i.   The appropriate injunctive and related equitable relief for the Nationwide Class; and

j.   The appropriate class-wide measure of damages for the Damages Class.

44

132. Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic levothyroxine sodium purchased indirectly from the Defendants and/or their co-conspirators.

133. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

134. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

135.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

136. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**FIRST COUNT**
**Violation of Section 1 and 3 of the Sherman Act**
**(on behalf of Plaintiff and the Nationwide Class)**

137.  Plaintiff repeats the allegations set forth above as if fully set forth herein.

138.  Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

139.  The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

140.  During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic levothyroxine sodium, thereby creating anticompetitive effects.

141.  The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic levothyroxine sodium.

142.  As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased generic levothyroxine sodium have been harmed by paying inflated, supracompetitive prices for generic levothyroxine sodium.

143.  In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

144.  Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for generic levothyroxine sodium has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for generic levothyroxine sodium provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiff and members of the Nationwide Class who purchased generic levothyroxine sodium indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

145. Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic levothyroxine sodium purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

146. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

147. Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND COUNT
### Violation of State Antitrust Statutes
### (on behalf of Plaintiff and the Damages Class)

148. Plaintiff repeats the allegations set forth above as if fully set forth herein.

149. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of generic levothyroxine sodium in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

150. The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supracompetitive prices for generic levothyroxine sodium.

151. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic levothyroxine sodium at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic levothyroxine sodium provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

152. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic levothyroxine sodium.

153. Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

154. Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for generic levothyroxine sodium was restrained, suppressed, and eliminated throughout Alabama; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Alabama Code § 6-6-60, *et seq*.

155.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for generic levothyroxine sodium was restrained, suppressed, and eliminated throughout Arizona; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

156. Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code Section §16720. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of generic levothyroxine sodium at supracompetitive levels. The aforesaid violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic levothyroxine sodium. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic levothyroxine sodium. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic levothyroxine sodium has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic levothyroxine sodium provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased generic levothyroxine sodium directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic levothyroxine sodium than

they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

157. Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4501, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic levothyroxine sodium that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic levothyroxine sodium in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic levothyroxine sodium, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiff and

members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

158. Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

159. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*). Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the Damages Class

were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

160. Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, *et seq.*

161. Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was

53

restrained, suppressed, and eliminated throughout Kansas; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

162. Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*). Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in

violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

163. Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

164. Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free

and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

165. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

166. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

167. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the

Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

168. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

169. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Defendants' combinations or

conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

170. Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout New York; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium that were higher than they would have been absent the Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

171. Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq*.

172. Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' combinations or

conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

173. Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages

Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

174. Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

175. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was

restrained, suppressed, and eliminated throughout Tennessee; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

176. Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code

63

Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

177. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

178. Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive,

artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

179.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

180.  Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination,

contract, conspiracy and agreement. Plaintiff and members of the Damages Class have paid more for generic levothyroxine sodium than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

181.  In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and members of the Damages Class.

182.  Accordingly, Plaintiff and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD COUNT**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiff and the Damages Class)**

183.  Plaintiff repeats the allegations set forth above as if fully set forth herein.

184.  Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

185.   Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic levothyroxine sodium was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct

on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

186. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic levothyroxine sodium in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic levothyroxine sodium in the State of California within the meaning of Section 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic levothyroxine sodium. Plaintiff and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Section

17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

187.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic levothyroxine sodium was sold, distributed, or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic levothyroxine sodium. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing generic levothyroxine sodium because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic levothyroxine sodium, including their illegal conspiracy to secretly fix the price of generic

levothyroxine sodium at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic levothyroxine sodium. Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. As a direct and proximate result of the Defendants' conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

188.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Damages Class were

deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

189.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

190.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq.* Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic levothyroxine sodium was sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11. Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute, including multiple damages.

191.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.* Plaintiff and members of the Damages Class purchased generic levothyroxine sodium for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic levothyroxine sodium in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic levothyroxine sodium was sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic levothyroxine sodium. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of generic levothyroxine sodium they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic levothyroxine sodium by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic levothyroxine sodium were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing generic levothyroxine sodium at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout Missouri; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

192.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.* Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class

Period, Defendants marketed, sold, or distributed generic levothyroxine sodium in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

193.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic levothyroxine sodium was sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and members of the Damages Class and the prices paid by them for generic levothyroxine sodium as set forth in N.M.S.A., § 57-12-2E. Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic levothyroxine sodium. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing generic levothyroxine sodium

because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic levothyroxine sodium, including their illegal conspiracy to secretly fix the price of generic levothyroxine sodium at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic levothyroxine sodium. Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

194. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agree to,

and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic levothyroxine sodium was sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic levothyroxine sodium that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic levothyroxine sodium; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic levothyroxine sodium were misled to believe that they were paying a fair price for generic levothyroxine sodium or the price increases for generic levothyroxine sodium were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic levothyroxine sodium would have an impact on New York consumers and not just the Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic levothyroxine sodium would have a broad impact, causing consumer class members who indirectly purchased generic levothyroxine sodium to be injured by paying more for generic levothyroxine sodium than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a

competitive manner. Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout New York; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants marketed, sold, or distributed generic levothyroxine sodium in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed generic levothyroxine sodium in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

195.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic levothyroxine sodium was sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false

justifications regarding their price increases. Defendants' public statements concerning the price of generic levothyroxine sodium created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants marketed, sold, or distributed generic levothyroxine sodium in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed generic levothyroxine sodium in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

196.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*) Members of this Damages Class purchased generic levothyroxine sodium for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic levothyroxine sodium was sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic levothyroxine sodium. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic levothyroxine sodium prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of

unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic levothyroxine sodium, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic levothyroxine sodium at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of generic levothyroxine sodium they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

197.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq.*). Defendants' combinations or conspiracies had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and,

accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

198.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic levothyroxine sodium was sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic levothyroxine sodium. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic levothyroxine sodium prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic levothyroxine sodium price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic levothyroxine sodium prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic levothyroxine sodium. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including

their affirmative misrepresentations and omissions concerning the price of generic levothyroxine sodium, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic levothyroxine sodium at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

**FOURTH COUNT**
**Unjust Enrichment**
**(on behalf of Plaintiff and the Damages Class)**

199.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

200.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic levothyroxine sodium.

201.     Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and members of the Damages Class for generic levothyroxine sodium manufactured by Defendants during the Class Period.

202.     Plaintiff and members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment that:

1.      The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination

alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.      Plaintiff and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.      Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Dated: December 22, 2016                    Respectfully submitted,


                                            By: */s/ Scott A. Martin*
                                            Irving Scher
                                            Scott A. Martin
                                            HAUSFELD LLP
                                            33 Whitehall Street, 14th Floor
                                            New York, NY 10004
                                            Tel: (646) 357-1100
                                            Fax: (212) 202-4322
                                            Email: ischer@hausfeld.com
                                            Email: smartin@hausfeld.com

Michael P. Lehmann
Bonny E. Sweeney
Christopher L. Lebsock
Stephanie Y. Cho
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com
Email: bsweeney@hausfeld.com
Email: clebsock@hausfeld.com

Michael D. Hausfeld
Sathya S. Gosselin
Jeannine M. Kenney
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeld.com
Email: sgosselin@hausfeld.com
Email: jkenney@hausfeld.com

Lee Albert (Pro Hac Vice to be Filed)
Gregory B. Linkh (GL0477)
GLANCY PRONGAY & MURRAY LLP
122 E. 42nd Street
Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
Fax: (212) 884-0988
Email: lalbert@glancylaw.com
Email: glinkh@glancylaw.com

*Counsel for Plaintiff*